## No 10,783.

### CHARLES OLIVIER VS. LOUISVILLE AND NASHVILLE RAILROAD COMPANY.

1. A party voluntarily boarding a crowded train, and taking his place on the platform of a car, without complaint, or effort to obtain a seat, or other better

Olivier vs. Railroad Co.

accommodation, can not assign the overcrowding of the train as negligence in the railroad company.

2. On the other hand, when the conductor sees him in that position, and collects his fare without objection, the company can not attribute its occupancy as negligence.

3. In such case the passenger is bound to conduct himself with the care and caution which his position requires, and the company is bound to guard him from danger incident to the position arising from its own acts.

4. A party's admissions as to the cause of an injury, for which he claims damages, are good evidence against him, and the statements of a companion made in his presence, without contradiction, may have the like force with his own admissions. In this case the latter were also admissible as part of the *res gestæ*, and to impeach his testimony given on the trial, for which foundation was duly laid.

5. Testimony in the case stated and discussed.

6. While always disposed to give to verdicts of juries all proper weight, the law of this State imposes on the court the duty of reviewing their findings on the facts, as well as on the law, and when, upon the evidence before us, it appears that a verdict is manifestly erroneous, we are bound to reverse it.

APPEAL from the Civil District Court for the Parish of Orleans. *Voorhies, J.*

### *Branch K. Miller* for Plaintiff and Appellee:

A suit can not be dismissed for failure to comply with an order for a bond for costs, under Act 136 of 1880, except upon a motion to that effect, setting forth the failure to file the bond, asking the dismissal. No additional bond for costs can be required, pending the trial. A suit can not be dismissed for failure to file a bond, after judgment; nor in any event after the bond is filed.

Previous statements, contradictory of the sworn statements of a witness, are received, not as independent proof, but only to impeach the witness. Thompson on Trials, Secs. 480, 490; 1 Wharton on Evidence, Sec. 551.

It is negligence for a railroad company to allow their cars to become so crowded as to compel passengers to ride on the platforms, When the whistle of an engine is blown for a stop, the speed of the train slackened, and diminished gradually, a passenger has the right to prepare for leaving the train; in doing this, he may stand up, and if in this position, he is, by a sudde⸱ start or jerk of the train, thrown from the platform, where the crowded condition of the cars has compelled him to ride, the railroad company is responsible for his damages. 49 Mich. 372; 4 Hun. (N. Y.) 409; 34 N. Y. 670, 676, 677; 36 N. Y. 136; 66 N. Y. 50, 52.

### *Bayne, Denègre & Bayne,* for Defendant and Appellant:

Plaintiff, a negro man about forty-three years of age, says that he has been in the habit of going on the cars to the Lake, fishing, for about thirty years; that he boarded the train at an intermediate station (Claiborne street); seeing that the cars were crowded, seated himself on the platform, where he was first seen by

the conductor at Gentilly, and then, through his friend Larose, paid his fare, fifteen cents. Near Milneburg, he stood up on the platform, with his basket on one arm. He either fell or jumped from the cars, and his foot was run over by the last wheel of the cars on which he was riding. He admitted at the time of the accident, that it was caused by his own fault and negligence. The evidence sustains these admissions as true, and being guilty of negligence contributing to the accident, he can not recover. 42 An. 990; 41 An. 297; 34 An. 1086; 33 An. 156; 32 An. 616; 30 An. 15; 9 An. 441; 4 An. 787; 31 An. 491; Snowden vs. Boston & M. R. R. Co., 151 Mass. Rep., p. 221.

The claim was only made seven months after the accident, on after thought, and is stale and speculative, and should be discouraged. 41 An. 864.

The accident occurred on the Pontchartrain Railroad, an independent corporation, for which the Louisville and Nashville Railroad Company is not liable. The latter railroad company is a large stockholder of the Pontchartrain Railroad Company, and is interested as such, and not otherwise. Pullman Car Co. vs. Missouri Pacific Co., 115 U. S. 5596; Morawitz on Private Corporations, Vol. 2, p. 969, Sec. 1009; City of New Orleans vs. Pontchartrain Railroad Company, 41 An. 519.

No damages are recoverable in this case, but, if any, the amount is grossly excessive. There are no special damages alleged or proved. 11 An. 292. Peyton vs. Texas Pacific Co., 41 An. 864, 794; Thompson on Negligence, Sec. 1208, et seq.; Sedgwick on Measure of Damages, Vol. 2, p. 538.

Section 4 of Act 136 of 1880, and the orders of the court made thereunder, operated a dismissal of this suit, and there was error in reinstating the case and compelling defendants to defend after the failure of plaintiff to comply with the orders of the court and the law, which operated as a dismissal of the suit. The necessity for the enforcement of the law is shown in this case, where the defendant has paid costs largely in excess of the bond given, more than double the amount for which security has been given.

---

The opinion of the court was delivered by

FENNER, J.   The cause of action is substantially as follows: That plaintiff became a passenger on defendant's railroad, having duly paid his fare for passage to Milneburg; that owing to the crowded condition of the train he was compelled to ride on the platform of one of the cars; that on approaching Milneburg, the engineer sounded the whistle to announce the stop to be made; that the speed of the train was diminished by degrees, inducing petitioner to believe it was about to stop, when the said train was suddenly put in sudden motion by the engineer thereof, causing a sudden and violent jerk or start, which threw petitioner from the platform under the wheels of the car, which passed over his foot and occasioned injuries which necessitated the amputation of his leg below the knee; that said injuries were due solely to the fault and negligence of defendant in this particularly:

"1. That he should have been provided with a seat in said train,

and not have been compelled, by the overcrowding of said car, to ride on the platform.

"2. That said train should not have been suddenly started after the diminution of its speed and the preparation and apparent intention of the engineer to stop the same."

Plaintiff avers his freedom from any contributory negligence, and demands $20,000 as damages.

Defendant answered by a general denial.

The case was tried before a jury, resulting in a verdict and judgment in favor of plaintiff for $5000, from which the present appeal is taken.

The first ground of negligence assigned against the company has no weight. According to his own statement, plaintiff boarded the train at a way station, after seeing and knowing that the train was crowded; and he also knew from his constant habit of traveling on the road that the trains on this day of the week and hour were customarily crowded. He voluntarily took his place on the platform; but he was lawfully there, because he occupied that position when the conductor collected his fare, and the latter made no objection thereto. He was bound to conduct himself with the care and caution which his position suggested and required; and the company was bound to protect him from damages incident to that position arising from its own acts.

The serious issue of law and fact arises under the second assignment of negligence, viz., in starting the train, when on the point of stopping, with such a jerk as to throw the plaintiff off.

Plaintiff produces no evidence as to the accident except that of himself and his companion, Larose. Plaintiff says that he and Larose were going out to the lake to fish; that they boarded the train at a way station; they saw the train was full, but got on the platform; plaintiff carried a basket; he took his seat on the platform of one car, with his feet resting on the step, while Larose sat on the platform of the car in front of him; when the car reached Milneburg and the whistle had blown, he got up and stood with his basket on one arm and holding the railing with the other hand to be ready to get down when the train stopped; that, while thus standing, and after the motion of the train had become very slow, the train was suddenly started and gave a violent jerk, which threw him off.

Larose gives a like account with some further particulars. He says:

"When she got just about a block before the old station, she blew, and Charlie says, 'Get ready.' I says, 'No, she is going too fast.' When we reached about the engine house, he says, 'Get ready.' I says, 'No, we can't, she is going too quick.' When we got about the corner she started to slack up, but not enough for us to get down, and when Charlie got right by the hotel, he stood up that way, and he told me to get ready, and I says 'Leave the car stop, I believe she is going to the wharf.'"

He adds that at this point the train gave a violent jerk and Olivier was thrown off.

The engineer denies most positively that he gave the train any forward motion after slowing down, or did anything to cause a jerk.

No witness is produced to show that there was any such jerk except Olivier and Larose.

Welsh, who was one of the conductors at that time, but who is no longer in the employ of defendant, says that he went to where plaintiff was lying, after the accident, and asked Larose, who was with him, how it happened, and Larose said, "It was all his own fault," and that " he was in the act of jumping or jumped off and fell."

Ross, the other conductor, who also is no longer in defendant's employ, says:

"I went to Mr. Olivier; he was sitting on the ground, and he says, ' I went to jump off and fell down and my leg went underneath,' and he says, 'I do that every Sunday,' and I says, ' You ought not to do that; you ought to wait till the train stops.'"

Philibert, the clerk and operator at the police station to which plaintiff was carried, says:

"He had been brought in from Milneburg and put in the station, and the ambulance sent for, and while waiting for the ambulance, so as to make a report to the chief officer, as we do in all cases, I asked the man for a statement as to how he got hurt, how his foot got mashed, asked him how it happened, and he said it was his own fault; that he jumped off the car and the train ran over his foot.".

Habans, a police officer stationed at Milneburg, says:

"I was on the rear coach of the train when the coach stopped—I mean the train—and I looked out and saw a lot of people congregated around the hotel gate, and I ran down there to see what was the

matter, and I saw a man sitting on the ground with his face toward the train, and his friend Larose with him. I says to him, ' Charlie, how did that happen?' and he says, ' I tried to jump off and I got my foot smashed.' So I went on and notified the engineer that the man was hurt, and he backed the baggage car down to put him in there."

He also adds:

" His friend told. me that Mr. Olivier had his basket on his arm and the train going in that direction, and when he attempted to jump off with his basket on his forward arm so, the basket struck the hand rail of the platform of the car and it threw him down."

Olivier and Larose, on re-examination, stoutly deny having made the statements attributed to them. Olivier seems to deny that he was asked any questions or made any answers to anyone. Larose says, " Olivier said it was only bad luck, and I said so myself."

It is a significant fact that neither Olivier nor Larose pretend to have said anything at that time about the jerk of the train, rendered more significant by the fact that this suit was not brought until nearly seven months after the accident; and, so far as the record discloses, that was the first time defendant heard anything about a jerk of the train.

It is further shown that plaintiff had been a constant traveler on this train for years, and that he had frequently jumped off the train before it stopped.

Larose's statement strongly intimates that plaintiff was making preparations to jump, and was only restrained by his remonstrance. We can not doubt that the conductors and the police officers did ques-ion Olivier and Larose as to the cause of the accident. It was their official duty to make such inquiries, because they had to render reports to their superior officers. If Olivier and Larose then attrib-uted the accident to the jerk of the train, it would have been natural for them to have said so, and it is passing strange they did not; yet neither of them pretend that they said anything about it. According to their own account, they simply said " it was only bad luck." No motive is suggested why the two police employés should have sworn falsely, and they fully confirm the statements of the con-ductors. They are supported by all the independent circumstances, negative as well as positive.

We have studied carefully the whole evidence, and have endeav-ored to state it fairly. Can it be expected that we should affirm a

judgment against defendant for $5000 on such proof, in view of the imperative requirement that plaintiff is bound to make his case reasonably certain?

Nothing is more irksome to us than the necessity we so frequently encounter to reverse the verdicts of juries in cases of this character. We are disposed to give their findings all the weight to which they are entitled; but the law of this State imposes on us the duty of reviewing their verdicts both on the facts and the law, and when the evidence submitted to us manifestly fails to support the verdict, we are bound to reverse it. We believe Olivier and Larose did make the statements attributed to them, and that those statements, made under the circumstances, must be taken as true.

The statements of Olivier are good evidence against him as his own admissions; and the statements of Larose, made in his presence and without contradiction by him, partake of the same character. Moreover, they are all part of the *res gestæ*.

It matters not whether they are considered as independent proof, or merely as destroying the credibility of the witnesses who swore in contradiction of their own prior statements; in either case they destroy plaintiff's action, because it has no other support than the testimony of these witnesses.

It is, therefore, ordered, adjudged and decreed that the verdict and judgment appealed from be annulled and set aside; and that there be now judgment in favor of defendant, rejecting the plaintiff's demand, at the latter's cost in both courts.